## DOUGLAS BELL, ET AL.

### V.

## COMMONWEALTH OF VIRGINIA

Record No. 860288

November 18, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and Gordon, Retired Justice

*Elizabeth Dashiell (Michael Morchower; Morchower, Luxton & Whaley*, on brief), for appellants.

*Edward P. Nolde, Assistant Attorney General (Mary Sue Terry, Attorney General; H. Lane Kneedler, Chief Deputy Attorney General; Gail Starling Marshall, Deputy Attorney General; Anthony Gambardella, Senior Assistant Attorney General; Gail D. Jaspen, Assistant Attorney General*, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

In this appeal, we consider whether, as the trial court ruled, Feelin' Great, Inc., a Nevada corporation with headquarters in Florida, is a "pyramid promotional scheme" within the purview of Code § 18.2-239.

The issue was framed in a proceeding initiated by a bill of complaint filed by the Attorney General of Virginia against Douglas

Bell and others,[1] individually and doing business as Feelin' Great, and the corporation itself (collectively, Feelin' Great). The Attorney General alleged, *inter alia*, that Feelin' Great's marketing operation was unlawful under Code § 18.2-239. Feelin' Great denied the allegation, and the trial court heard evidence *ore tenus*.

Feelin' Great, which is authorized to conduct business in Virginia, offers "participants" two methods of self-development. One is a motivational course of instruction called "Steps to Greatness" (Steps); the other is the opportunity to qualify as a salesman entitled to earn commissions on the sales of the Steps. Prospective customers are invited to attend, without charge, an "opportunity meeting" where they hear an explanation of the program. They then are invited to attend a weekend "New Life Seminar" and a workshop for which they pay a fee of $80. During the weekend, lecturers representing Feelin' Great and using scripts prepared at the corporation's national headquarters instruct recruits in the nature and purpose of the Steps. From those lectures, punctuated by the "Money Song" and group cheers, recruits learn how they can earn substantial sums of money for part-time work.

As explained to new recruits, the motivational course consists of four Steps. In Step One, the recruit attends an eight-hour seminar in which he receives a cassette tape and explanatory materials on self-awareness, faith, enthusiasm, and nutrition. Step Two consists of a 12-hour seminar, additional materials, and a tape recorder; the topics discussed include public speaking, attitudes, and goals. In Step Three, a 14-hour seminar is devoted to such subjects as developing a healthy mind, self-confidence, human values, and personal responsibilities. At this Step, the recruit receives more cassette tapes, a briefcase, and an award of merit. Step Four concludes the motivational course in a 14-hour seminar on weight control, exercise, diet, and nutrition.

The fee charged for Step One is $1,000, for Step Two, $1,500, and for each of Steps Three and Four, $1,750, making a total of $6,000. Several witnesses called by Feelin' Great described the benefits they had derived from their investment in these Steps. The Attorney General does not challenge the value or the legality of the motivational phase of the operation. The Attorney Gen-

---

[1] The other respondents were Diane Bell, Mike Smith, Tara Jackson, Charles McClendon, Jr., and Mike Doane.

eral's complaint and the trial court's ruling address only the marketing phase.

Purchase of the Steps does not entitle the purchaser to sell Steps on commission to other recruits. In order to earn that right, a recruit first must become a "Qualifying Executive Sales Director" (QESD) and then an "Executive Sales Director" (ESD). To become a QESD, he must enlist an existing ESD to sponsor his sales. To advance to ESD status himself, a QESD must generate $10,000 in Step sales and attend an ESD workshop. Although a QESD is not required to buy any Steps himself, if he buys all four Steps, he would need to sell only $4,000 worth of Steps to third parties to qualify for the right to earn a commission on additional sales.

Once qualified, an ESD can earn a commission of 30% on his own sales, a 30% commission on any sales made by a QESD under his sponsorship, and a 10% supervisor's bonus on sales made by any person he had recruited and who had qualified as an ESD in his own right. Recruits were told that they could earn as much as $1,800 per month. According to Feelin' Great's own records at the time of trial, 34 Virginia participants had paid Feelin' Great $137,900. The ESDs had earned $14,850 in ESD commissions. None, however, had earned as much as $1,000 per month.

Based upon findings of fact and rulings announced in a letter opinion, the trial court entered a final order enjoining Feelin' Great's marketing operation and assessing civil penalties, costs, and attorney's fees against the corporation and the individual respondents.[2] The court expressly excluded the motivational course of instruction from the operation of the injunction.

The pertinent statute provides:

§ 18.2-239. Pyramid promotional schemes; misdemeanor; definitions; contracts void. — Every person who contrives, prepares, sets up, operates, advertises or promotes any pyra-

---

[2] The trial court also found, as the Attorney General had alleged, that Feelin' Great had violated the provisions of the Virginia Consumer Protection Act, Code §§ 59.1-196 through -207, which prohibits "fraudulent acts or practices committed by a supplier in connection with a consumer transaction", § 59.1-200. Feelin' Great argues on brief that "[p]enalties pursuant to § 18.2-239 and § 59.1-206 are inconsistent" and asks us to reverse "the portion of the judgment entered . . . pursuant to . . . § 59.1-206". Feelin' Great did not raise the point for the benefit of the trial court, and we will not consider it for the first time on appeal. Rule 5:25.

mid promotional scheme shall be guilty of a Class 1 misdemeanor. For the purposes of this section:

(a) *"Pyramid promotional scheme"* means any program utilizing a pyramid or chain process by which a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for inducing other persons to become participants in the program;

(b) *"Compensation"* does not mean payment based on sales of goods or services to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme; and

(c) *"Promotes"* shall mean inducing one or more other persons to become a participant.

All contracts and agreements, now existing or hereafter formed, whereof the whole or any part of the consideration is given for the right to participate in pyramid promotional scheme programs, are against public policy, void and unenforceable.

Feelin' Great insists that it is not a pyramid promotional scheme because, it says, it does not require "a participant [to give] a valuable consideration for the opportunity to receive compensation." *Id.*

It is true that a recruit is not required to pay Feelin' Great any of his own money in order to acquire the opportunity as an ESD to earn commissions. But, definitionally, the term "consideration" includes more than payment of money.

Consideration is, in effect, the price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made. It matters not to what extent the promisor is benefited or how little the promisee may give for the promise. A very slight advantage to the one party or a trifling inconvenience to the other is generally held sufficient to support the promise.

*Brewer* v. *Bank of Danville*, 202 Va. 807, 815, 120 S.E.2d 273, 279 (1961).

 As the price of the promise to afford a participant an opportunity to earn commissions, Feelin' Great requires a QESD to generate a $10,000 volume of Step sales. Even though a QESD makes no personal purchases, in the process of persuading others to make purchases, he has suffered a detriment in time and effort and he has conferred a benefit — a valuable consideration — upon Feelin' Great. Indeed, the money an individual QESD generates is only part of the benefit he confers upon Feelin' Great. Each new participant a QESD recruits in the motivational program is a potential ESD, and, potentially, every ESD will recruit new participants who, in turn, may become QESDs and, eventually, ESDs. As the number in the chain of participants expands and the market for new recruits declines, the law of diminishing returns begins to operate against the interests of those who become participants late in the process. Once the market is exhausted, no participant — recruit, QESD, or ESD — has an "opportunity to receive compensation . . . in return for inducing other persons to become participants in the program." Code § 18.2-239(a).

 Next, Feelin' Great maintains that, even if the $10,000 volume requirement satisfies the definition of "consideration" as that word is used in § 18.2-239(a), the commissions it pays for additional sales are not "compensation" within the meaning of that term as used in that subsection. Subsection (b) of the statute provides that payments do not constitute "compensation" when they are "based on sales of goods or services to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme". On brief, Feelin' Great contends that an ESD "is unquestionably compensated based on the *sale of goods and services* [emphasis in original]", that the commissions are not paid to ESDs as compensation for inducing other persons to participate in the scheme, and, hence, that its program does not violate the statute.

 The evidence of the manner in which the program is conducted defeats that contention. From the group of 34 Virginia participants, Feelin' Great called several witnesses who testified that their motive in making Step purchases was the opportunity to improve themselves rather than the opportunity to earn compensation. Yet, the predominant theme of the songs, cheers, printed materials, and tape recordings used at the New Life Seminar and

the QESD workshop was that a new recruit could utilize the marketing phase of the program to recoup any investment he might make in the Steps. In addition, he was told he could earn a large profit simply by inducing others to invest and participate in the program. Both in promise and in performance, the commissions were "compensation" within the intendment of Code § 18.2-239(a).

We are of opinion that Feelin' Great's marketing operation is typically a "pyramid promotional scheme", and we will affirm the judgment as entered below.

*Affirmed.*